IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 13, 2003 Session

## STATE OF TENNESSEE v. FRANKIE LEDBETTER

**Direct Appeal from the Circuit Court for Marion County**
**No. 5311     Thomas W. Graham, Judge**

_____

**No. M2002-02125-CCA-R3-CD - Filed August 7, 2003**

_____

The defendant was convicted of incest and rape of a child and sentenced to twenty-three years at 100% for the rape of a child conviction and eight years as a Range II, multiple offender for the incest conviction, the sentences to be served concurrently. The defendant was also fined $50,000 for the rape of a child conviction and $10,000 for the incest conviction. On appeal, the defendant presents the following claims: (1) the evidence was insufficient to support his convictions; (2) the trial court erred in determining that the six-year-old victim was competent to testify and improperly vouched for the credibility of the child-victim; (3) the trial court erred in giving the expert witness instruction to the jury; and (4) the trial court denied the defendant a fair trial by refusing to let him conduct a voir dire examination of each juror individually and out of the presence of the other jurors. Upon review, we affirm the judgments of the trial court but remand for entry of corrected judgments to reflect that the defendant was convicted of Counts 3 and 4, rather than Counts 1 and 2, of the indictment and to reflect the defendant's fines which were omitted from the judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed and
Remanded for Entry of Corrected Judgments**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and DAVID H. WELLES, JJ., joined.

Philip A. Condra, District Public Defender (on appeal and at trial); and Jeffery Harmon, Assistant District Public Defender (at trial), for the appellant, Frankie Ledbetter.

Paul G. Summers, Attorney General and Reporter; Braden H. Boucek, Assistant Attorney General; James Michael Taylor, District Attorney General; and Sherry D. Gouger and Julia N. Oliver, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## FACTS

On June 13, 2000, the victim, ML,[1] stayed with the defendant, who was her father, at her grandmother's home, while her mother and grandmother worked. The victim testified that, at some point during the day, she was watching television when the defendant "took [her] in the dining room and put a sock in [her] mouth." The defendant then carried the victim into her mother's bedroom and laid her on her back on the floor. Thereafter, the defendant sat on the victim's stomach, unzipped his pants, and "stuck his privates in [the victim's] mouth and peed." The victim also said that the defendant told her not to tell anyone what had happened; however, the victim informed her grandmother of the sexual abuse as soon as she returned home from work.

The victim's grandmother, Debra Layne, testified that on June 13, 2000, she and her daughter, the victim's mother, left for work at 6:00 a.m., leaving the victim and her sister in the care of the defendant. Layne's husband and other children also lived in the home at that time. When Layne returned home from work at 4:00 p.m., the victim did not greet her at the car, which was unusual. After learning from the defendant that the victim was at a neighbor's, Layne summoned the victim home. The defendant and one of Layne's sons left to go pick up the victim's mother from work. After speaking with the victim, Layne took her and her sister to the police station, where they were referred to the Department of Human Services ("DHS"). Layne later accompanied the victim, the victim's sister, and their mother to T.C. Thompson Children's Hospital, where the victim was examined.

The victim's mother, Holly Sanders, testified as Layne did, that she left the victim in the care of the defendant, while she and Layne went to work on June 13, 2000. Sanders' stepfather, three brothers, and youngest sister were also at the house when she left for work that morning. When she returned home from work around 6:30 p.m., an officer came to the residence. After speaking with this officer, Sanders went to the DHS, where she met Layne and the victim. Thereafter, Sanders drove the victim to T.C. Thompson Children's Hospital, where she was examined by Kevin Mounce, a licensed physician's assistant.

Finally, the State called Kevin Mounce to testify. Mounce stated that he examined the victim on June 13, 2000, at approximately 11:00 p.m. and found edema (swelling) on her lower lip and discoloration in the middle of her lower lip resembling early bruising.

After the prosecution put on its proof, the defendant called Colette Young and Taffy Wilson as witnesses. Young, a forensic interviewer for the Children's Advocacy Center of Hamilton County, testified that she interviewed the victim on June 15 and 16, 2000. Wilson, a child protective services investigator with the Marion County Department of Children's Services ("DCS"), testified that the

---

[1]It is the policy of this court to refer to minor victims of sexual abuse by their initials only.

victim's grandmother brought the victim to the DCS around 5:30 p.m. on the day of the incident. The victim's mother and Officer Gene Hargis later came to the DCS.

Next, the defendant called Detective Gene Hargis of the Marion County Sheriff's Department who testified that he was present at the DCS with the victim, Sanders, and Layne. The victim's clothing was subsequently collected and sent to the Tennessee Bureau of Investigation Crime Laboratory.

The defendant then recalled Mrs. Layne who said that, approximately one week after the June 13, 2000, incident, the victim told her that on the date in question she was mad at her father because he would not let her go swimming.

The defendant testified that he often babysat the victim and her sister while their grandmother and mother worked, and he was babysitting them on June 13, 2000. Sanders' stepfather and brother were at the house that day, as well. He recalled the victim throwing a tantrum that day because he did not allow her to go swimming. The defendant denied all allegations of sexual abuse and also denied putting a sock in the victim's mouth. He further testified that he was not aware that anything unusual had happened that day until a police officer arrived at the Layne home and asked him to vacate the premises. The defendant admitted having a prior felony theft conviction.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant argues that the evidence was insufficient to support his convictions because the facts to which the victim testified "lead to the inescapable conclusion the Defendant could not have inserted his penis into ML's mouth from the position that she placed him." Additionally, the defendant argues that the victim's testimony was not credible because she could not describe the defendant's penis and she "had no reaction to pee going down her throat."

In considering this issue, we apply the familiar rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."). All questions involving the credibility of witnesses, the weight and value given to the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State."

State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (Tenn. 1966) (citing Carroll v. State, 370 S.W.2d 523 (Tenn. 1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendant was convicted of rape of a child and incest. Tennessee Code Annotated section 39-13-522(a) defines rape of a child as "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if such victim is less than thirteen (13) years of age." Incest is defined, in pertinent part, as:

> (a) A person commits incest who engages in sexual penetration as defined in § 39-13-501, with a person, knowing such person, to be, without regard to legitimacy:
>
> (1) The person's natural parent, child, grandparent, grandchild, uncle, aunt, nephew, niece, stepparent, stepchild, adoptive parent, adoptive child[.]

Tenn. Code Ann. § 39-15-302(a).

On direct examination, the victim testified that the defendant took her into her mother's bedroom, laid her on her back on the floor, and sat on her stomach. She said that the defendant "stuck his privates in [her] mouth and peed," and then told her not to tell anyone. Kevin Mounce, the physician's assistant who later examined the victim, found "[s]ome swelling in her lower lip[] and . . . noticed in the mid-line or the middle of her lip there was some discoloration, which [he], in looking at that, felt like it was some early bruising," although stating he could not determine what had caused the bruising.

Our supreme court has stated that "'[n]o jury can be allowed to return a verdict based upon oral evidence which is flatly opposed to physical facts, the existence of which is incontrovertibly established,'" State v. Hornsby, 858 S.W.2d 892, 894 (Tenn. 1993) (quoting Wood v. United States,

342 F.2d 708, 713-14 (8th Cir. 1965)). However, the defendant presented no proof of any physical facts that would make the victim's explanation impossible to have occurred. There were no cross-examination questions regarding the position of the defendant and the victim nor was there any testimony by the defendant's witnesses, including the defendant himself, that such positioning would have made the act in question impossible. That the facts which the defendant attempts to utilize in the present appeal to support his impossibility claim are inadequate to do so is apparent when compared with testimony establishing such a claim. See Wood, 342 F.2d at 713 ("From the scanty, indefinite and indecisive proof adduced at appellant's trial, it is wholly inconceivable, by any process of logic or reasoning from the facts disclosed in this record, how appellant might, could, or did, board a moving freight car, traveling ten (10) to fifteen (15) miles per hour, and within a distance of 'ten blocks' i.e. less than one (1) mile, or within at the very most four to six minutes, 'break the seal' of the refrigerator car . . ., make 'entry' therein with intent to, and did throw meat therefrom."); see also Hornsby, 858 S.W.2d at 896 ("While the two eyewitnesses testified that the pickup truck was travelling northbound . . . and the Pontiac was travelling eastbound . . ., the physical facts do not support their testimony. The damage to the Pontiac was limited to the left or driver's side of the vehicle. The damage to the pickup was limited to the front of the vehicle. Had the two vehicles been travelling as indicated by the witnesses, the damage to the Pontiac would have been to the right or passenger's side of the vehicle--not the left or driver's side. The physical facts are consistent with the [Defendant's] testimony regarding the direction of the vehicles. Moreover, the investigating officer . . . reached this conclusion based upon the statements of the witnesses at the scene, the location of the damage on the respective vehicles, the gouge mark found in the pavement, and other physical facts."). In sum, the testimony in the present appeal does not support the defendant's claim of impossibility.

Moreover, questions about the victim's credibility were resolved by the jury. The jury heard the testimony and observed the demeanor of both the victim and the defendant. The defendant testified that the incident did not happen; the victim testified that it did. The jury resolved the obvious conflict in favor of the victim. The fact that the victim did not see the defendant's penis may go to her credibility, but it does not make the facts in question impossible nor overcome the fact that the jury resolved the conflicts in testimony in favor of the victim. Accordingly, we conclude that the evidence was sufficient to support both convictions.

## II. Qualification of the Victim as a Witness

As to ML, who was six years old and in the first grade at the time of trial, the defendant argues both that the trial court did not follow the required procedures in determining whether she was competent to testify and, when she then testified, neglected to properly administer the oath, treating her in such a way as to confer the court's "stamp of approval" to her testimony. Because of the relationship of these issues, we will consider them jointly for purposes of our review.

Rule 601 of the Tennessee Rules of Evidence creates a presumption that all witnesses are competent to testify unless otherwise provided in the rules or by statute. Tenn. R. Evid. 601. The Advisory Commission Comment explains this presumption:

> Virtually all witnesses may be permitted to testify: children, mentally incompetent persons, convicted felons. Rules 602 and 603 should be read in connection with this rule, however, because any witness must swear or affirm to tell the truth and must have personal knowledge of that truth. The common law rebuttably presumed children under fourteen incompetent, Ball v. State, 188 Tenn. 255, 219 S.W.2d 166 (1949), but the proposed rule is contra.
>
> . . . .
>
> The amendment removes the earlier language requiring "of sufficient capacity to understand the obligation of an oath or affirmation" and establishes a rebuttable presumption of competency.

Tenn. R. Evid. 601, Advisory Commission Cmt. Rule 603 of the Tennessee Rules of Evidence requires that "[b]efore testifying, every witness shall be required to declare that the witness will testify truthfully by oath or affirmation, administered in a form calculated to awaken the witness's conscience and impress the witness's mind with the duty to do so."

The determination as to whether ML was competent to testify was a discretionary decision of the trial court, which will not be overturned on appeal unless the court clearly abused its discretion. State v. Hallock, 875 S.W.2d 285, 293 (Tenn. Crim. App. 1993). The key issue for the trial court was whether the six-year-old victim had the ability to understand the necessity of telling the truth while testifying in the proceedings. State v. Ballard, 855 S.W.2d 557, 560 (Tenn. 1993). "[T]here is no requirement that the witness have sufficient academic learning to define an oath or articulate its obligations." State v. Fears, 659 S.W.2d 370, 375 (Tenn. Crim. App. 1983).

Prior to her testimony, the trial court questioned ML:

THE COURT: Okay. Now, are you [ML]?

[ML]: (Nods head up and down.)

THE COURT: If you'll come around and sit in that chair right there, I want to ask you a couple of questions, okay.
[ML], you're [ML], is that right?

[ML]: (Nods head up and down.)

THE COURT: How old are you?

[ML]: Six.

THE COURT: [ML], I need to ask you a couple of questions about your understanding of what the truth is and what a lie is. Do you know the difference in what the truth is and what a lie is?

[ML]: (Nods head up and down.)

THE COURT: What is the truth?

[ML]: You tell them what they did.

THE COURT: And what would a lie be? Give me an example of what a lie would be?

[ML]: You'll get in trouble if you don't tell them.

THE COURT: Is a lie a bad thing?

[ML]: (Nods head up and down.)

THE COURT: To tell a lie is something that you should not do, is that right?

[ML]: (Nods head up and down.)

THE COURT: You should tell the truth, is that right?

[ML]: (Nods head up and down.)

THE COURT: Now, if I ask you to tell me and promise me that you will tell the truth, will you do that?

[ML]: (Nods head up and down.)

THE COURT: You won't tell me a lie, will you?

[ML]: (Nods head from left to right.)

THE COURT: Are you in the first grade right now, [ML]?

[ML]: Yeah.

THE COURT: Were you in kindergarten last year?

[ML]: Yeah.

THE COURT: Where did you go to kindergarten?

[ML]: Swiss Elementary.

. . . .

THE COURT: Where are you in school now?

[ML]: Still the same school.

THE COURT: Still at Swiss, okay. Do you remember things that happened last year while you were at elementary school, I mean kindergarten?

[ML]: (Nods head up and down.)

. . . .

THE COURT: Are you learning how to read?

[ML]: I know how to read now.

THE COURT: You do, good. . . . Did they teach you to read some last year in kindergarten?

[ML]: No.

THE COURT: But you do know how to read some now, is that right?

[ML]: (Nods head up and down.)

THE COURT: What can you read?

[ML]: I can read Mac the Cat and Crack Story.

. . . .

THE COURT: Does [sic] people talk in your room sometimes?

[ML]: Raven comes in and jumps on me, that's my baby sister.

THE COURT: Oh, I see, she jumps on you. Well, I was thinking more about in school, do people talk a lot of times in school and people has to say be quiet?

[ML]: Huh-uh.

THE COURT: Do you know how many people are in your class?

[ML]: Thirteen.

THE COURT: Thirteen. Okay. Now, you're going to be ask[ed] some questions about some things that happened about a year ago and do you remember those things?

[ML]: (Nods head up and down.)

THE COURT: And if I make you promise to me that you'll tell only those things that you can remember, will you keep that promise?

[ML]: (Nods head up and down.)

The defendant presented no proof to rebut the presumption that ML was competent to testify. Accordingly, our determination as to whether the trial court abused its discretion in concluding that ML was competent to testify is based upon the questions of the trial court and her responses. We conclude that this exchange between the trial court and ML shows that she understood the difference between the truth and a lie, that lying was "bad," and that she would not lie during her testimony. Thus, her testimony showed that she understood the need to tell the truth. See Fears, 659 S.W.2d at 375.

The ability of ML to remember facts and relate them to the jury about the time surrounding the incident was demonstrated by her responses to the trial court, as well as to counsel during her testimony. Her responses to the court's questions as to where she attended school, her grade and classmates, and her ability to read, showed that she could remember and relate facts. On direct examination, she responded to the State's questions:

Q [ML], can you tell us what your whole name is?

A [ML].

Q And [ML], how old are you now?

A Six.

Q   And do you know when your birthday is?

A   April the 9th.

Q   Okay.  And do you go to school anywhere?

A   Swiss.

Q   Swiss Elementary?

A   Yes.

Q   And what grade are you in?

A   First grade.

Q   First grade.  Do you like going to school?

A   Yes.

Q   How many people do you have in your class?

A   Thirteen.

Q   Thirteen people?

A   Yes.

Q   And what's your teacher's name?

A   Ms. Higgins.

Q   Do you remember what your teacher's name was last year in kindergarten?

A   No.

Q   Okay.

A   Her name was Ms. Reid.

Q   Ms. Reid. [ML], do you know what your real mama's name is?

A   Holly.

Q   And how about your real daddy?

A   Frankie.

. . . .

Q   Before you started kindergarten who did you live with?

A   My real mama.

Q   Okay.  That would be Holly?

A   Yes.

Q   Who else did you live with?

A   I lived with Granny.

Q   And what is her name?

A   Granny Debra [Layne].

Q   Okay.  Who else lived with you?

A   Crystal and Matthew.

Q   Crystal and that would [be] Aunt Crystal and Uncle Matthew?

A   Yes.

Q   Who else?

A   Uncle Bo and that's it.

Q   Okay.  Do you have a baby sister?

A   Yes.

Q   And what's her name?

A   Raven.

Q   Did your daddy live with you last year?

A   No.

Q   Did he come over some?

A   Yes.

Q   Last year did you[r] mama and your grandma work?

A   Yes.

Q   Who watched you when they went to work?

A   My real daddy.

The victim was able to recall these facts, despite the fact that she had been living with a foster family from the time of the incident to the date of the trial. Therefore, it is evident that she had the ability to remember and relate facts about the time surrounding the incident with little difficulty. Facts that she could not remember with great detail or that conflicted with the testimony of other witnesses were matters for the jury to weigh in determining her believability. State v. Carruthers, 35 S.W.3d 516, 558 (Tenn. 2000), cert. denied 533 U.S. 953, 121 S. Ct. 2600, 150 L. Ed. 2d 757 (2001) (the "appellate court may not reconsider the jury's credibility assessments").

Appellate courts have recognized the trial court's "unique ability to observe the witness," as in United States v. Thai, 29 F.3d 785, 810 (2nd Cir. 1994), where the district court judge had observed that a robbery witness, who was six and one-half years old at the time of the crime, was "a very intelligent child, a bright child who understood the process and knew what this was about, so I find her – to the extent that that is even an issue, I find her competent to testify." Id. at 809. In the present appeal, the trial court stated at the motion for new trial as to ML:

> I want the record to be clear that the Court thought this was a particularly believable small child and I understood how the jury could find the way they did based on the way this child testified. She was extremely direct. The transcript is not maybe as clear about how she appeared in court was actually the case and so I think this is a credibility issue that both the jury and the Court thought that her testimony on the significant important issue was believable.

We conclude that the trial court did not abuse its discretion in determining that ML was competent to testify. See State v. Griffis, 964 S.W.2d 577, 591-92 (Tenn. Crim. App. 1997) (child-victim, five years old at the time of trial, was competent to testify).

Additionally, the defendant argues that the trial court did not act impartially because, by its treatment of ML, it vouched for her credibility. This contention is based upon an exchange, which occurred after the court had concluded that she was competent to testify and as the jury was to return to the courtroom. Just before the jury returned, defense counsel stated to the trial court:

> Judge, I just want to make it clear on the record again of my concern and the Court's questioning of [the victim] in front of the jury is that the Court does not inadvertently leave the impression that it is suggested that no matter what she says it's going to be true, that's what I'm concerned with.

The jury then returned, and the trial court introduced the victim and questioned her:

> THE COURT: All right, this is [ML], who's seated here in the chair and obviously she's six years old and not too tall. I hope everybody – can everybody see [ML]?
>
> [ML], you and I had a little talk before the jury came in and I talked to you about telling the truth. Do you remember that?
>
> [ML]: (Nods head up and down.)
>
> THE COURT: Okay. And you promised that you will tell the truth to the jury and to everybody here, didn't you?
>
> [ML]: Yes.
>
> THE COURT: Okay. And you also indicated to the Court that you knew if you would tell a lie that that would be a bad thing, is that right?
>
> [ML ]: Yes.
>
> THE COURT: Okay, now these lawyers are going to ask a few questions of you and you just answer from your own memory of events as best you possibly can, okay.
>
> [ML]: (Nods head up and down.)

ML then proceeded to testify without comment or objection by the defense.

On appeal, the defendant argues that "[t]he Court never asked the question it stated it would ask so as to require ML 'to declare [she] will testify truthfully by oath or affirmation, administered

-13-

in a form calculated to awaken the witness's conscience and impress [her] mind with the duty to do so,'" quoting from Rule 603, Tennessee Rules of Evidence. Additionally, he argues that after the trial court had determined that ML should testify, "it was incumbent upon the Court to proceed with the child as with any other witness: administer an oath and allow counsel to question." Instead, according to the defendant's argument, the trial court gave the jury the message that ML "had told the trial court a true story and now she was going to tell a true story to the jury."

We respectfully disagree with the defendant's view of the trial court's responsibilities or actions. In dealing with a child who is to testify, the trial court may utilize language which is appropriate to the situation, as explained by Neil P. Cohen et al., Tennessee Law of Evidence, § 6.03[4] (4th ed. 2000):

> Because children lack the understanding, vocabulary, and experience of adults, courts may fashion a child-oriented oath for a child witness. This oath may deal simply with such matters as the difference between truth and falsehood, that lying is improper, and that the child promises to tell the truth.

In the present appeal, the trial court in the presence of the jury reminded ML that she earlier had promised to be truthful and had said that telling a lie "would be a bad thing," asking then that she answer the lawyers' questions "as best [she] possibly can." By this language, we believe that the trial court complied in a reasonable fashion with the requirement of Rule 603 that it impress upon the six-year-old witness her duty to be truthful. Since the defendant did not advise the court, as ML was about to testify, that, in the defendant's view, the court had vouched for her as a witness, no determination was made as to whether a curative instruction should be given. Accordingly, we conclude that this objection is waived. See Tenn. R. App. P. 36(a). Even if not waived, however, it is without merit.

## III. Expert Witness Instruction

The defendant contends that the trial court erred in charging the jury with an expert witness instruction for the testimony of Kevin Mounce, the physician's assistant who examined the victim, arguing that this caused the jury to give undue weight to his testimony.

The admission of expert testimony is governed by Tennessee Rules of Evidence 702 and 703. The qualification of a witness as an expert is left to the sound discretion of the trial court. See Ballard, 855 S.W.2d at 562; Otis v. Cambridge Mut. Fire Ins. Co., 850 S.W.2d 439, 442 (Tenn. 1992). Principles for the trial court to follow in deciding whether to admit scientific or technical evidence are set out in Rule 702, which states:

> **Testimony By Experts.** — If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an

> expert by knowledge, skill, experience, training, or education may
> testify in the form of an opinion or otherwise.

Tenn. R. Evid. 702; see also McDaniel v. CSX Transp., 955 S.W.2d 257, 264 (Tenn. 1997). Scientific or technical evidence, like all evidence, must first be relevant to a fact at issue in the case. See Tenn. R. Evid. 401, 402. If relevant, scientific or technical evidence must also meet the requirements of Rule 702.

Mounce testified that he had a bachelor's degree in allied health, including twenty-four months of medical training. Additionally, he had been employed in the medical field for seventeen years, thirteen of which was in the area of pediatrics. Although opining that Mounce was more of a fact witness than an expert witness, the trial court stated that he was "expert enough to know whether it's something that was a bruise or not a bruise." Based on this statement, it is evident that the trial court concluded that Mounce was going to testify as an expert regarding the victim's injuries.

It is evident that Mounce qualified as an expert in terms of his education, training, and experience with children. As such, his opinion as to what constituted edema and the signs of early bruising on a child was permissible pursuant to Rule 702. Accordingly, we cannot conclude that the trial court abused its discretion in determining that the expert jury instruction should be given, as it is the court's obligation to properly charge the jury on all the issues of law that were raised by the evidence at trial. State v. McAfee, 737 S.W.2d 304, 308 (Tenn. Crim. App. 1987).

### IV. Denial of Individual Voir Dire of Prospective Jurors

The defendant asserts that the trial court erred by not allowing individualized voir dire because of the nature of the charges – incest and child rape. To support his proposition, the defendant notes that when the judge asked the jurors, "Does anybody have any experience yourself or with a close family member with a charge of any kind of sexual misconduct of a small child or any child?" three potential jurors raised their hands. The defendant further asserts that six more jurors indicated, in response to the trial court's question as to whether they could remain impartial in a case like this, that they would have a hard time being impartial and would lean toward believing the child.

The purpose of voir dire is to ensure that jurors seated at trial are competent, unbiased, and impartial. See State v. Mann, 959 S.W.2d 503, 533 (Tenn. 1997). The trial court is granted broad discretion in deciding the manner in which voir dire will be conducted, and its decisions in this regard will not be disturbed on appeal absent a showing of abuse of discretion. See State v. Stephenson, 878 S.W.2d 530, 540 (Tenn. 1994). We review the defendant's issue, therefore, under an abuse of discretion standard.

Rule 24(a) of the Tennessee Rules of Criminal Procedure states:

> The court shall cause the prospective jurors to be sworn or affirmed to
> answer truthfully the questions they will be asked during the selection

process, identify the parties and their counsel, and briefly outline the nature of the case. The court may put to the respective jurors appropriate questions regarding their qualifications to serve as jurors in the case and shall permit questioning by the parties for the purpose of discovering bases for challenge for cause and enabling an intelligent exercise of peremptory challenges. The court, upon motion of a party or on its own motion, *may* direct that any portion of the questioning of a prospective juror be conducted out of the presence of the tentatively selected jurors and other prospective jurors.

Tenn. R. Crim. P. 24(a) (emphasis added). Further, "[t]he prevailing practice in this state is to examine the jurors collectively rather than individually." State v. Oody, 823 S.W.2d 554, 563 (Tenn. Crim. App. 1991). Individual voir dire, however, is mandatory when there is a significant chance that a prospective juror has been exposed to potentially prejudicial material. Id.; see also State v. Shepherd, 862 S.W.2d 557, 568 (Tenn. Crim. App. 1992) (noting that at least nine of the members of the jury had seen an "Unsolved Mysteries" television program about the defendant, and ten of the jurors were aware that the defendant was charged with more than one murder).

The defendant argues the trial court erred in disallowing individualized voir dire; however, the record clearly reflects that those seven individuals were removed from the general jury pool and questioned individually. Although the trial court did not initially question the jurors individually, there were no facts to indicate such a process was necessary, the record not reflecting that this was a highly publicized case or that any of the jurors were familiar with the case or the defendant. Without something in addition to the nature of the crime to necessitate individual voir dire, we cannot conclude that the trial court abused its discretion. In making this determination, we note that when the court became aware that several of the jurors had personal knowledge or feelings about the nature of the crime that prevented them from being impartial, they were excused from the courtroom, questioned individually, and ultimately excused.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court but remand for entry of corrected judgments to reflect that the defendant was convicted of Counts 3 and 4 of the indictment and that fines of $10,000 and $50,000, respectively, were assessed.

_____
ALAN E. GLENN, JUDGE